**PUBLISH**

**September 12, 2011**

**UNITED STATES COURT OF APPEALS**

**Elisabeth A. Shumaker**
**Clerk of Court**

**TENET CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellant,

v.

           No. 10-2060

CARL ROY BURLESON,

  Defendant - Appellee.

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:08-CR-02642-MV-1)**

Richard A. Friedman, Attorney, United States Department of Justice (Kenneth J. Gonzales, United States Attorney; Nathan J. Lichvarcik, Assistant United States Attorney; Lanny A. Breuer, Assistant Attorney General; Gregory D. Andres, Acting Deputy Assistant Attorney General, with him on the briefs), Washington, D.C., for Plaintiff-Appellant.

Steve G. Sosa, Assistant Federal Public Defender, Las Cruces, N.M., for Defendant-Appellee.

Before **O'BRIEN, SEYMOUR,** and **EBEL,** Circuit Judges.

**EBEL**, Circuit Judge.

_____

Defendant-Appellee Carl Roy Burleson and two companions were stopped by a Roswell police officer because they were walking in the middle of the street and because they were carrying an unleashed dog, which aroused the officer's suspicions. After telling the three individuals that they were not permitted to walk in the street and satisfying himself that the dog was not stolen, the officer asked the individuals for their names and requested a warrants check on each of them. Police dispatch informed the officer that Mr. Burleson had an outstanding warrant, and during the ensuing arrest, the officer found two handguns and ammunition on Mr. Burleson.

In the district court, Mr. Burleson moved to suppress evidence of the handguns and ammunition as fruit of an unlawful seizure under the Fourth Amendment. The district court granted the motion, concluding that at the time the officer obtained Mr. Burleson's identity and requested the warrants check, the officer had already completed the purposes of the detention and thus he had no lawful basis to further detain Mr. Burleson. The government appeals that decision. Exercising jurisdiction under 18 U.S.C. § 3731, we reverse.

## I.    BACKGROUND

### A.    Factual Background

Shortly before midnight on May 2, 2008, Officer Jeff Kuepfer of the Roswell, New Mexico, Police Department was patrolling a neighborhood in Roswell when he

2

observed Mr. Burleson and two companions exit an alleyway and begin walking in the middle of the street side-by-side. One of the individuals was carrying a pit bull without a leash.

Officer Kuepfer decided to question the individuals for two reasons. First, they were walking in the middle of the street, which is a violation of a New Mexico statute and a Roswell ordinance. Second, they were carrying a dog that appeared to be older than a puppy, which Officer Kuepfer found odd and which concerned Officer Kuepfer based on reports of dog thefts in the city. Officer Kuepfer therefore believed that further investigation was appropriate, especially in light of the fact that the police department had within the past week received reports of criminal activity in the immediate area, including property damage, vehicular burglaries, and a shooting. Although Officer Kuepfer did not intend to cite the individuals for a traffic violation, he wanted to give them a verbal warning for walking in the street, find out who they were and what they were doing, find out why they were carrying the dog, and determine whether the dog could have been stolen.

Officer Kuepfer thus got out of his patrol car and asked the group to "hold up." (Aplt. App'x. at 21.) He approached them and informed them that they were not permitted to walk in the middle of the street. He then talked to them about what they were doing and about the dog, after which he asked for their names:

> I just basically said, Hey, how you guys doing tonight? Just, what's going on? Where are you heading? And, through just talking to them, I found out that they were heading home, that the dog was theirs, that the reason

3

why they were carrying the dog was because, if they put him down, he'd run off from them. So that made sense to me, okay. Asked them for their names.

(Id.)

Once Officer Kuepfer obtained their names, he immediately requested a warrants check on each of them, using the portable radio attached to his belt. Shortly thereafter, police dispatch responded that there was an outstanding warrant for an individual named Carl Burleson. The total duration of this initial encounter, from the time at which Officer Kuepfer stopped the individuals to the time at which dispatch informed Officer Kuepfer that Mr. Burleson may have an outstanding warrant, was three to five minutes.

At that point, Officer Kuepfer told Mr. Burleson that he may have an outstanding warrant, and asked Mr. Burleson for identification or for his date of birth and Social Security number so that Officer Kuepfer could verify that the warrant really was for Mr. Burleson. Mr. Burleson provided his date of birth and Social Security number, and Officer Kuepfer confirmed that the warrant was indeed for Mr. Burleson. Officer Kuepfer then told Mr. Burleson that he was under arrest for the warrant, and while Mr. Burleson was turning around, he told Officer Kuepfer, "Just so you know, I do have guns on me." Officer Kuepfer handcuffed Mr. Burleson and, during the ensuing a pat-down, discovered two handguns and ammunition in Mr. Burleson's pants pocket and waistband.

## B. Procedural Background

On November 13, 2008, Mr. Burleson was indicted in the United States District Court for the District of New Mexico for possession of a firearm subsequent to a felony

4

conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  On June 22, 2009, Mr. Burleson filed a motion to suppress the handguns, arguing that Officer Kuepfer's seizure of Mr. Burleson violated his rights under the Fourth Amendment.  On September 8, 2009, the district court held an evidentiary hearing on Mr. Burleson's motion, at which Officer Kuepfer was the only witness to testify.

On February 8, 2010, the district court issued an order granting Mr. Burleson's motion to suppress.  The court determined that the encounter between Officer Kuepfer and Mr. Burleson was not consensual, but that Officer Kuepfer had sufficient justification to stop Mr. Burleson and his companions because they were committing a pedestrian traffic violation by walking in the middle of the street.  However, the court concluded that Officer Kuepfer exceeded the permissible scope of the detention when he ran the warrants check.  Specifically, the court noted Officer Kuepfer's own testimony that when he stopped the group he did not intend to issue anyone a citation but rather simply administer a verbal warning.  The court then determined that his initial statement to the group that they were not permitted to walk in the middle of the street constituted his intended "verbal warning."  (Aplt. App'x. at 82.)  The court found that Officer Kuepfer then asked the group what they were doing, where they were going, and why they were carrying the dog, and that, according to his own testimony, Officer Kuepfer was satisfied with the answers given by Mr. Burleson and his companions.

The court determined that "at that point, Officer Kuepfer had accomplished his stated purpose for the stop of issuing a warning regarding the traffic violation and had

5

satisfied his concerns about any other possible criminal activity they may have been involved in with respect to the dog." (Id.)  Because the court found no evidence that the group did anything further to raise additional suspicion of criminal activity by that point, it determined that Officer Kuepfer "had no lawful basis for continuing the detention to run a warrant check on [Mr. Burleson] and his companions." (Id. at 83.)  Accordingly, the court concluded that "the guns and ammunition discovered in [Mr. Burleson's] possession pursuant to his arrest constitute fruit of the poisonous tree and should be suppressed." (Id. at 84.)

On March 4, 2010, the Government filed a motion for reconsideration.  The government argued that the district court's grant of the motion to suppress contravened United States v. Villagrana-Flores, 467 F.3d 1269 (10th Cir. 2006), in which we held that it was not a violation of the Fourth Amendment for an officer to run a warrants check during an investigative stop of a pedestrian.[1]  The district court, however, distinguished Villagrana-Flores on two bases.  First, the court determined that there was no question that the officer in Villagrana-Flores had reasonable suspicion to detain the defendant at the time the officer ran the warrants check, whereas in this case "Officer Kuepfer's reasonable suspicion had dissipated entirely when he ran the warrants check." (Aplt. App'x at 93.)  Second, the court determined that the officer in Villagrana-Flores was

---

[1] It does not appear from the record that the government raised, or the district court considered, Villagrana-Flores until the government filed its motion for reconsideration.

presented with a "precarious situation" involving a detainee "who may have presented a danger to the officer," whereas in this case "Officer Kuepfer had no objective basis for fearing for his safety." (Id.) Accordingly, the district court denied the government's motion for reconsideration. The government filed a timely notice of appeal of this decision as well as the district court's earlier grant of Mr. Burleson's suppression motion.

## II.    DISCUSSION

On appeal, the parties do not challenge the district court's determinations that (1) the encounter between Officer Kuepfer and Mr. Burleson was not consensual, and (2) the initial detention was nonetheless justified because Officer Kuepfer observed Mr. Burleson and his companions commit a pedestrian traffic violation. Thus, the only issue on appeal is whether Mr. Burleson was lawfully detained at the time that Officer Kuepfer checked his name for warrants. As discussed below, we answer this question in the affirmative.

### A.    Standard of Review

"When reviewing an order granting or denying a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous, and we view the evidence in the light most favorable to the district court's determination." United States v. Caro, 248 F.3d 1240, 1243 (10th Cir. 2001). However, we review de novo the district court's legal conclusions, United States v. Prince, 593 F.3d 1178, 1184 (10th Cir. 2010),

7

including "the ultimate determination of reasonableness under the Fourth Amendment."

Caro, 248 F.3d at 1243.

**B.      An Officer May Perform a Warrants Check on a Pedestrian During the Course of a Lawful Investigatory Stop.**

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. Const. amend. IV. "One type of seizure is an investigatory stop," United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir. 2010), in which "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," Terry v. Ohio, 392 U.S. 1, 22 (1968). Under Terry, an investigatory stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 20.[2]

In order to satisfy this requirement, the ensuing detention "must not exceed the reasonable duration required to complete the purpose of the stop." United States v. Rice, 483 F.3d 1079, 1082 (10th Cir. 2007). Accordingly, in the context of an investigatory stop of a motorist, "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009). The detention

_____

[2] Of course, Terry also requires that the investigatory stop be "justified at its inception." Terry, 392 U.S. at 20. As indicated above, Mr. Burleson does not dispute that his violation of pedestrian traffic laws by walking in the street justified the initial detention.

8

cannot be continued beyond this point "unless the driver consents to further questioning or the officer has reasonable suspicion to believe other criminal activity is afoot." Rice, 483 F.3d at 1083-84. Even a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment. See United States v. Lopez, 443 F.3d 1280, 1285 (10th Cir. 2006) ("The Supreme Court has also made clear . . . that an individual 'may not be detained even momentarily without reasonable, objective grounds for doing so.'" (quoting Florida v. Royer, 460 U.S. 491, 498 (1983))).

However, it is well-settled in the traffic-stop context that while an investigative detention is ongoing, a police officer may obtain an individual's name and check that name for outstanding warrants. See Villa, 589 F.3d at 1339 ("It is well-established that: A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." (internal quotation marks omitted));[3] United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) ("[A] motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the

---

[3] A "computer check" includes running a search to determine whether the detainee has any outstanding warrants. See United States v. McRae, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996) ("While a 'computer check' could encompass many different kinds of data retrieval, we have held that an officer who had lawfully stopped a vehicle could contact dispatchers who had instant access to the National Crime Information Center (NCIC) computer records that could quickly resolve, with reasonable certainty, whether there were warrants outstanding against the driver and whether the car had been reported stolen." (internal quotation marks omitted)).

9

motorist even though the purpose of the stop had nothing to do with such prior criminal history."), abrogated on other grounds as stated in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007); United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997) ("An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen.").

In Villagrana-Flores, this Court applied these principles to the context of an investigatory stop of a pedestrian. In that case, police in St. George, Utah, received reports of a man in a public office building who appeared to be mentally ill. 467 F.3d at 1272. An officer arrived on the scene and observed the defendant, Mr. Villagrana-Flores, exhibiting "delusional and paranoid behavior." Id. Believing that Mr. Villagrana-Flores was a danger to himself and possibly others, the officer detained him and shortly thereafter ran a warrants check. Id. Because this check revealed outstanding warrants and prior deportations, the officer arrested Mr. Villagrana-Flores, who was ultimately indicted for illegal reentry. Id.

On appeal, Mr. Villagrana-Flores argued that his Fourth Amendment rights were violated when the officer ran a warrants check during a Terry stop. Id. at 1272-73. This Court disagreed. We first observed that it is well-established that an officer may ask a suspect to identify himself in the course of a Terry stop. Id. at 1275. This is because obtaining a detainee's identity "'serves important government interests,'" such as informing the officer "'that a suspect is wanted for another offense, or has a record of

10

violence or mental disorder.'" Id. (quoting Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 186 (2004)). Thus, we concluded that because the initial detention of Mr. Villagrana-Flores was justified based on reasonable suspicion, the officer "was also justified in obtaining Mr. Villagrana-Flores's identity." Id. at 1276.

We then addressed "whether the officer was justified in using Mr. Villagrana-Flores's identity to run a warrants check during the course of the Terry stop." Id. We noted our prior holding in Holt that in the context of traffic stops based on reasonable suspicion, an officer may run a background check on a motorist to check for warrants or criminal history even though the purpose of the stop had nothing to do with the motorist's history. Id. We reiterated our earlier determination that "'[t]he justification for detaining a motorist to obtain a criminal history check is, in part, officer safety' because '[b]y determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop.'" Id. at 1277 (alteration in original) (quoting Holt, 264 F.3d at 1221-22). Thus, we affirmed that "[a]s long as the detention is for a short period, the government's strong interest in officer safety outweighs the motorist's interests." Id. (internal quotation marks omitted).

We then reasoned that "[o]fficer safety . . . is just as strongly implicated where the individual being detained for a short period of time is on foot, rather than in an automobile," and thus that "[a]n officer detaining a pedestrian has an equally strong interest in knowing whether that individual has a violent past or is currently wanted on

11

outstanding warrants." Id. Conversely, we concluded that the pedestrian's interest "is no more robust merely because a short detention occurs while traversing on foot." Id. We further determined that "permitting a warrants check during a Terry stop on the street also 'promotes the strong government interest in solving crimes and bringing offenders to justice.'" Id. (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)). We reasoned that "an identity's utility in informing an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder, would be non-existent without the ability to use the identity to run a criminal background check." Id. (internal alteration and quotation marks omitted). Accordingly, we held that "Mr. Villagrana-Flores's Fourth Amendment rights were neither violated when his identity was obtained during a valid Terry stop nor when his identity was shortly thereafter used to run a warrants check." Id.[4]

In sum, we concluded in Villagrana-Flores that the same rationale that underlies our conclusion as to the permissibility of warrants checks in the motorist context applies with equal force in the pedestrian context. Contrary to the government's statement at oral argument, this conclusion is not dicta, but reflects the holding of Villagrana-Flores. See id. at 1275, 1277 (holding that it is not a violation of the Fourth Amendment for an

_____

[4] We also noted that the act of running a criminal background check itself does not implicate the Fourth Amendment. Villagrana-Flores, 467 F.3d at 1277 n.4 ("[T]he Fourth Amendment is not implicated simply because a name, legally obtained, is later used to run a criminal background check. That action is neither a search nor a seizure, for there is no legitimate expectation of privacy in one's criminal history.").

12

officer who performs a <u>Terry</u> stop on an individual suspected of engaging in criminal activity to obtain that individual's identity and perform a warrants check, and thus that the warrants check on Mr. Villagrana-Flores, a pedestrian, was permissible).

**C.     The District Court Erred in Concluding That the Stop Had Been Completed When Officer Kuepfer Ran the Warrants Check and in Distinguishing <u>Villagrana-Flores</u> on Officer-Safety Grounds.**

<u>Villagrana-Flores</u> thus establishes that an officer, during the course of a lawful <u>Terry</u> stop of a pedestrian, may obtain that pedestrian's identification and request a warrants check. This holding is dispositive in this case, as we conclude that Officer Kuepfer requested the warrants check during the course of a lawful <u>Terry</u> stop of Mr. Burleson. In reaching the opposite conclusion, we believe the district court clearly erred in two respects. First, the district court found that the stop had been completed by the time Officer Kuepfer asked Mr. Burleson for his name. As discussed below, this finding is not supported by the record. Second, the district court distinguished <u>Villagrana-Flores</u> on officer-safety grounds, determining that the officer in that case was presented with a "precarious situation" involving a detainee "who may have presented a danger to the officer," whereas here "Officer Kuepfer had no objective basis for fearing for his safety." (Aplt. App'x at 93.) As discussed below, this reflects errors of law and fact, as running a warrants check is not justified solely on officer-safety concerns and, in any event, Officer Kuepfer was presented with objective reasons for being concerned about his safety in this case.

13

1. Viewed objectively, the stop had not been completed before Officer Kuepfer ran the warrants check.

As discussed above, Terry requires that an investigative stop be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. This is an objective test; the reasonableness of the stop does not "depend[] on the actual motivations of the individual officers involved." Whren v. United States, 517 U.S. 806, 813 (1996); see also United States v. Johnson, 364 F.3d 1185, 1189 (10th Cir. 2004) (explaining that at both stages of the Terry analysis (the initial stop and the scope of the subsequent investigatory detention), "the reasonableness of the officer's suspicions is judged by an objective standard taking the totality of the circumstances and information available to the officers into account" (internal quotation marks omitted)).

Viewed objectively, Officer Kuepfer had not completed the Terry stop by the time he requested the warrants check. Officer Kuepfer stopped the individuals because they had committed a pedestrian traffic violation and because they were carrying the dog without a leash. With respect to the first basis for the stop, it is objectively reasonable for an officer in that situation to assess the circumstances and then decide whether to issue each individual a written traffic citation or to let them go with a verbal warning. See United States v. Guerrero-Espinoza, 462 F.3d 1302, 1307 (10th Cir. 2006) ("In the course of a routine traffic stop, a trooper may . . . run necessary computer checks, and then issue any warning or citation. Once those tasks are completed, a driver must be allowed to

14

proceed on his way . . . ." (emphasis added) (internal quotation marks omitted)). Whether an officer opts for a citation, a warning, an arrest, or some other action will depend in part on what transpires during the detention, including the results of the computer check. For example, Officer Kuepfer testified that while he usually lets people off with a warning, he will (and has) written citations in situations in which an individual does not believe him that walking in the street constitutes a traffic violation. It is objectively reasonable for an officer, in detaining an individual who has committed a traffic violation, to investigate whether a warning, a citation, or some other action is warranted. In this case, nothing in the record indicates that Officer Kuepfer had concluded this predicate investigation by the time he obtained the individuals' names and requested a warrants check. Although Officer Kuepfer told the individuals when he first stopped them that they were not permitted to walk in the middle of the street, there is no evidence that by making this initial statement the objective purposes of the stop had been completed.

With respect to the second basis for the stop (investigation into whether the dog had been stolen), it is objectively reasonable for an officer in that situation not only to ask questions as to whether the dog actually belongs to the detainees, but also to obtain their names and confirm their identities in case the dog is later reported stolen. See Hiibel, 542 U.S. at 186 ("Our decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many Terry stops."); Hayes v. Florida, 470 U.S. 811, 816 (1985) ("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to

15

question him briefly, or to detain him briefly while attempting to obtain additional information."). Indeed, Officer Kuepfer testified that he asked for the identities of Mr. Burleson and his companions for this very purpose. (See Aplt. App'x at 41 (testifying that he wanted to obtain the individuals' names before he let them go because "[t]hat way, . . . if a report came in the next day, Hey, my dog was stolen last night, at least now I have some names to go with, Hey, I saw these three guys last night and they were carrying a dog").) And in obtaining the identities of the individuals, it is reasonable not only to ask them for their names, but also to request identifications to confirm the veracity of their answers.

Of course, an investigative detention "must not exceed the reasonable duration required to complete the purpose of the stop." Rice, 483 F.3d at 1082; see United States v. Sharpe, 470 U.S. 675, 686 (1985) ("On assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ."). Here, Mr. Burleson does not dispute the government's assertion, based on Officer Kuepfer's testimony, that only three to five minutes elapsed between the beginning of the stop and the point at which dispatch informed Officer Kuepfer that Mr. Burleson might have an outstanding warrant. We conclude that this is well within an objectively reasonable time for Officer Kuepfer to

16

have performed the permissible investigatory tasks that he did under the circumstances of this stop.[5]

In reaching a contrary conclusion, the district court impermissibly considered Officer Kuepfer's subjective intent. Specifically, with respect to Officer Kuepfer's detention of Mr. Burleson for walking in the middle of the street, the district court found that it was not Officer Kuepfer's intention to issue Mr. Burleson a citation. After discussing Officer Kuepfer's initial warning to the group and his satisfaction with the individuals' answers regarding the dog, the court stated, "Therefore, at that point, Officer Kuepfer had accomplished his stated purpose for the stop of issuing a warning regarding the traffic violation and had satisfied his concerns about any other possible criminal activity they may have been involved in with respect to the dog." (Aplt. App'x at 82 (emphasis added).) On its face, this reflects the district court's consideration of Officer Kuepfer's initial, subjective intention in determining whether the stop had ended by the time Officer Kuepfer requested the warrants check. This was error. Whether the detention was reasonable when Officer Kuepfer requested the warrants check depends on

---

[5] We do not here draw a bright-line rule that five minutes is always a reasonable amount of time to conduct a Terry stop. Indeed, "there is no absolute rule for determining how long an investigative detention may continue before it becomes unreasonable under the Fourth Amendment." United States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004). "Rather, the length of the stop and the potential intrusion on an individual's Fourth Amendment rights must be juxtaposed against the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." Id. (internal quotation marks omitted).

17

the objective circumstances of the stop, not on whether Officer Kuepfer initially had intended to issue a verbal warning or to write three separate traffic citations or to take some other action.[6]

In addition, the district court's reliance on Lopez and United States v. Luckett, 484 F.2d 89 (9th Cir. 1973) (per curiam), to support its determination that the warrants check exceeded the reasonable scope of the stop is misplaced. In Lopez, a police officer observed the defendant and another man standing in the middle of the street next to a parked car. 443 F.3d at 1282. The officer ran a check on the license plate of the car and then asked the men if either of them owned the car. Id. Lopez responded that the car was his. Id. The officer then approached the two men and asked for identification. Id. Lopez provided a driver's license, which listed an address that matched the address of the registered owner of the car. Id. Nonetheless, the officer took the license back to his patrol car and ran a warrants check, which revealed that Lopez had an outstanding

---

[6] In denying the government's motion for reconsideration, the district court defended its earlier determination on the basis that "objectively, [Officer Kuepfer] lacked reasonable suspicion to continue to detain [Mr. Burleson] and his companions: Not only did their answers to his questions quell the suspicions that justified the initial stop, but nothing in the men's behavior during the encounter could have given rise to additional suspicion." (Aplt. App'x at 92.) However, this only reflects an objective determination as to Officer Kuepfer's investigation regarding the dog. The court did not address its earlier reliance on Officer Kuepfer's subjective intention in finding that the other aspect of the detention (enforcing the traffic offense) necessarily ended once Officer Kuepfer made his initial statement to the group. As discussed above, viewed objectively, the stop did not end simply because Officer Kuepfer made this statement.

warrant.  Id.  Lopez was arrested and searched, which revealed crack in his pants pocket. Id.

The district court granted Lopez's motion to suppress, and this Court affirmed.  Id. at 1282, 1286.  We determined that once the officer had reviewed Lopez's license and confirmed that the address matched the address on the car registration, "the continued retention of Lopez's license was undue."  Id. at 1285.  Because the officer had no probable cause or reasonable suspicion to detain Lopez until the warrants check was completed, we concluded that the officer's actions violated the Fourth Amendment.  Id. at 1286.

Lopez, however, is inapposite to Mr. Burleson's case.  In Lopez, the government conceded that the officer "did not have reasonable suspicion of criminal activity when he first contacted Lopez," id. At 1282, instead arguing that the encounter was consensual, id. At 1283.  Here, conversely, Officer Kuepfer observed an actual statutory violation.  Thus, Officer Kuepfer had reasonable suspicion to detain Mr. Burleson and his companions, and, as discussed above, could run a warrants check as a part of that detention.  See Villagrana-Flores, 467 F.3d at 1275, 1277; United States v. Lyons, 510 F.3d 1225, 1235 (10th Cir. 2007) ("[B]ecause there was a violation of Kan. Stat. Ann. § 8-133, [the officer] could temporarily detain Lyons, while requesting his driver's license and vehicle registration, running a criminal history check and issuing him a warning ticket." (emphasis added)).

Indeed, in Lyons, the Tenth Circuit distinguished between cases in which an officer's suspicion of criminal activity had "evaporated" based on a closer inspection of a vehicle's registration tag, and cases in which an actual violation had occurred, concluding that a warrants check was permissible in the latter cases. See 510 F.3d at 1236 ("[The officer's] suspicion for stopping Lyons' vehicle (illegible expiration tag) did not evaporate, but rather was confirmed, once he stopped Lyons' vehicle. Therefore, [the officer's] detention of Lyons while performing a license and vehicle registration check and issuing a warning ticket did not violate the Fourth Amendment."). The same distinction applies in Mr. Burleson's case—Officer Kuepfer's reasonable suspicion that Mr. Burleson violated the traffic statute did not "evaporate" before Officer Kuepfer called in the warrants check.

As for Luckett, in that case two police officers observed the defendant jaywalking, so they waived him over to the patrol car and requested identification. 484 F.2d at 90. Luckett produced five pieces of identification, but not a driver's license. Id. The officers gave him a traffic citation, but then continued to detain him to run a warrants check based on the purportedly suspicious circumstance that he did not have a driver's license. Id. The check revealed an outstanding warrant, and following a subsequent arrest and search, police found counterfeit money orders in Luckett's pocket. Id.

The Ninth Circuit affirmed the district court's suppression of this evidence. Id. at 91. The Ninth Circuit concluded that under Terry, the officers could only detain Luckett for "the time necessary to obtain satisfactory identification from the violator and to

20

execute a traffic citation." Id. The court determined that the police had completed both of these tasks when they ran the warrants check, and that "[b]ecause they had no reasonable grounds to be suspicious that there might be a warrant outstanding against him, this continued detention was unreasonable." Id.

This out-of-circuit authority is not controlling within the Tenth Circuit. In addition, it is distinguishable from the circumstances of our case. Here, Officer Kuepfer never gave Mr. Burleson or his companions a citation, as happened in Luckett to conclude the purpose of that stop. As described above, the objective circumstances of the stop here indicate that the detention was still ongoing when Officer Kuepfer requested the warrants check. Accordingly, unlike the officers in Luckett, Officer Kuepfer did not improperly extend the detention without reasonable suspicion in order to run a warrants check.

> 2. The permissibility of requesting a warrants check does not depend solely on the presence of officer-safety concerns, and, in any event, such concerns were present in this case.

In denying the government's motion for reconsideration, the district court construed Villagrana-Flores as applying only where officer safety is a concern under the specific facts of a given case. (See Aplt. App'x at 93 ("Villagrana-Flores does not stand for the proposition that a pedestrian traffic violation automatically justifies a warrants check regardless of the continued presence of reasonable suspicion or the objective calculus of officer safety.").) The court determined that in this case, given the cooperative disposition of Mr. Burleson and his companions, Officer Kuepfer was not

21

presented with any objective safety concerns, and therefore <u>Villagrana-Flores</u> did not apply. (<u>See</u> <u>id.</u> ("Whereas the officer in <u>Villagrana-Flores</u> was in a precarious situation after detaining a visibly disturbed individual who may have presented a danger to the officer, Officer Kuepfer had no objective basis for fearing for his safety.").) In reaching this conclusion, the district court committed errors of law and fact.

It is true that in <u>Villagrana-Flores</u> we recognized that officer-safety concerns justified running a warrants check during a <u>Terry</u> stop because determining whether a detainee has outstanding warrants may inform an officer whether the detainee might engage in violent behavior during the detention. 467 F.3d at 1277. However, we did not base our decision solely on officer-safety concerns. We also determined that "permitting a warrants check during a Terry stop on the street also 'promotes the strong government interest in solving crimes and bringing offenders to justice.'" <u>Id.</u> (quoting <u>Hensley</u>, 469 U.S. at 229); <u>see also</u> <u>Holt</u>, 264 F.3d at 1221 ("The justification for detaining a motorist to obtain a criminal history check is, <u>in part</u>, officer safety." (emphasis added)). Thus, although a concern for officer safety is a central reason for upholding the use of warrants checks during a legitimate detention, it is not the only reason. Here, Officer Kuepfer was justified in performing a warrants check even in the absence of objective safety concerns because he was entitled to determine whether any of the detainees were evading justice. Indeed, his action accomplished this purpose, and Mr. Burleson was apprehended on an outstanding warrant.

In any event, the district court's factual finding that "Officer Kuepfer had no objective basis for fearing for his safety" was clearly erroneous. (Aplt. App'x at 93.) Officer Kuepfer, who was alone, stopped three individuals at midnight in an area that had within the past week experienced significant criminal activity, including a shooting. Under these circumstances, any officer would have reasonable concerns for his or her safety. Moreover, even where detainees are initially cooperative—as Mr. Burleson and his companions were on the night in question—this does not automatically dispel any safety concerns an officer may have. While these particular individuals ultimately did not present Officer Kuepfer with any threat of harm during the encounter, this is an easy assessment to make in hindsight. At the time Officer Kuepfer called in the warrants check, the risk of an uneven, dangerous confrontation remained, and thus his actions were justified on officer-safety grounds.

## III. CONCLUSION

For the reasons discussed above, we REVERSE the district court's grant of Mr. Burleson's motion to suppress and remand for further proceedings.