**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 5, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant.

v.

SHAWN MICHAEL NORTON,

    Defendant - Appellee.

No. 24-2059

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:21-CR-01827-DHU-1)**
_____

James R. W. Braun, Assistant United States Attorney (Alexander M. M. Uballez, United States Attorney, with him on the briefs), Office of the United States Attorney, Albuquerque, New Mexico, for Plaintiff – Appellant.

Violet N. D. Edelman, Assistant Federal Public Defender, Office of the Federal Public Defender, Albuquerque, New Mexico, for Defendant – Appellee.
_____

Before **TYMKOVICH**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

The Government appeals the district court's order suppressing DNA evidence that the Government obtained pursuant to a search warrant. The district court suppressed the evidence because it decided the warrant violated *Franks v. Delaware*,

438 U.S. 154 (1978), in which the Supreme Court held that the Fourth Amendment prohibits an affiant from recklessly or intentionally including a material, false statement of fact in a search-warrant affidavit. *Id.* at 155–56.

Here, the warrant affidavit included a false statement made to the affiant by New Mexico Highlands University Police Chief Clarence Romero. Chief Romero made the false statement to FBI Agent Bryan Acee, who in turn included the statement in an affidavit for a search warrant to obtain Appellee Shawn Michael Norton's DNA. The district court ruled that the inclusion of Chief Romero's false statement in the affidavit violated *Franks*. On appeal, the Government argues only that *Franks* is inapplicable to Chief Romero because he was off duty at the relevant time and did not possess an official investigatory role.

We hold that *Franks* extends to an off-duty police officer who is actually involved in an investigation with the knowledge and acquiescence of the on-duty officers. Whether a police officer is actually involved in an investigation is a mixed question of law and fact that is primarily factual in nature, and which we thus review for clear error. Applying that standard, we affirm.

## I.    BACKGROUND

### A.    *Factual History*

On October 23, 2021, several members of the Mongols Motorcycle Club were at the Byron T's Saloon in Las Vegas, New Mexico, including Mr. Norton and his girlfriend, Aundrea Perez. While the group was sitting on the Saloon's front patio, law enforcement officers from an interagency gang task force drove up, exited their vehicles

2

with guns drawn, and told the entire group "to put their hands in the air and get on the ground." ROA at 245. The officers served arrest warrants on two members of the group. Shortly after the officers arrived, Chief Romero, who was off duty and sitting inside the Saloon with his wife, Barbara Martinez,[1] told the officers he believed Ms. Perez had taken something from Mr. Norton. An officer then asked Ms. Perez if she was armed, and she admitted to having a gun in her purse. Both Ms. Perez and Mr. Norton were ultimately arrested for carrying a firearm in a liquor establishment, a violation of New Mexico law.

After the officers had secured the scene, Chief Romero and Ms. Martinez approached Deputy Jayme Vigil and gave statements. This conversation was recorded on Deputy Vigil's lapel camera. Chief Romero told Deputy Vigil that one of the motorcyclists "was friendly with the bartender at the [S]aloon"; that Chief Romero had learned from the Saloon's staff there was a camera on the front patio and there were cameras in the bar pointed at the patio windows; and that when the motorcyclists first arrived, he and Ms. Martinez started assessing if any were "armed and dangerous." *Id.* at 246; *see* Lapel Video at 1:42–2:22.

Chief Romero and Ms. Martinez then told Deputy Vigil about a suspicious interaction they had observed between Mr. Norton and Ms. Perez. From their vantage point inside the Saloon near a window, Chief Romero and Ms. Martinez could observe Mr. Norton and Ms. Perez on the patio, although their view was partially obstructed by a

---

[1] Ms. Martinez is herself a retired law enforcement officer.

planter. When the task force members approached the motorcyclists, Chief Romero and

Ms. Martinez observed Mr. Norton stand and put his hands up. When Ms. Perez also

stood up, Mr. Norton moved in front of her, and she lifted his vest. *Id.* at 246.

Deputy Vigil asked Chief Romero and Ms. Martinez if they "saw anything removed or

anything placed" under the vest, and both shook their heads no—Chief Romero stated

that all he saw "was the vest go up." Lapel Video at 3:50–56. Chief Romero and

Ms. Martinez stated they could see Ms. Perez moving after she lifted Mr. Norton's vest,

but they could not tell what she was doing because their view was obstructed. *Id.* at 3:57–

4:02. When Deputy Vigil asked them if they saw "where [Ms. Perez's] hands went after"

she lifted Mr. Norton's vest, both stated they just saw Ms. Perez sit back down. *Id.* at

4:02–12.

Two days later, Deputy Vigil submitted a statement of probable cause in state

court to support Mr. Norton's arrest for unlawful carrying of a firearm in a drinking

establishment. Deputy Vigil included information from her conversation with

Chief Romero and Ms. Martinez, stating she "made contact with two [witnesses] who

. . . observed [Mr.] Norton step in front of [Ms.] Perez," at which point Ms. Perez lifted

"up [Mr.] Norton's leather vest in the back." ROA at 25. Deputy Vigil averred that

neither witness saw "if anything was removed or placed" under the vest. *Id.*

On November 1, 2021, the district attorney for Las Vegas, New Mexico called FBI

Agent Acee and asked him to consider pursuing charges against Mr. Norton for

possession of a firearm. Before agreeing to do so, Agent Acee determined he would need

a search warrant for Mr. Norton's DNA so he could match it with DNA on the firearm

4

found in Ms. Perez's purse. Agent Acee hoped to use the DNA evidence to clarify some perceived contradictions between Deputy Vigil's statement of probable cause and the arrest report. After Agent Acee learned that the main "witness was a law enforcement officer," he decided it was "best to go to the source of the information and not worry so much [about] what the booking officers had written." *Id.* at 193.

Agent Acee interviewed Chief Romero the next day. Chief Romero told Agent Acee that when the task force arrived at the Saloon, he saw Ms. Perez move behind Mr. Norton and lift his vest. Chief Romero stated he then saw Ms. Perez remove an unknown object from Mr. Norton, after which she "moved away and sat down." *Id.* at 73. Chief Romero told Agent Acee that Ms. Perez placed the object she had taken "[i]n her black purse." *Id.*

The next day, Agent Acee filed an affidavit in support of a search warrant for Mr. Norton's DNA. Agent Acee included the information provided by Chief Romero in the affidavit, attesting that "Chief Romero observed [Ms. Perez] remove an object from the small of [Mr. Norton's] back and place it into her black purse." *Id.* at 32. A magistrate judge found the affidavit established probable cause for the search warrant, and DNA samples were subsequently taken from Mr. Norton that matched samples taken from the gun.

On November 8, 2021, Mr. Norton was charged in the U.S. District Court for the District of New Mexico for possession of a firearm and ammunition as a felon under 18 U.S.C § 922(g)(1).

### B.    Motion to Suppress

In September 2023, Mr. Norton filed a motion to suppress his DNA evidence, arguing "it was obtained in violation of the Fourth Amendment and *Franks*." ROA at 20. In *Franks*, the Supreme Court held that when a defendant shows "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by [an] affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that . . . . the fruits of the search [be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." 438 U.S at 156–57. In so holding, the Court explained that the Fourth Amendment's warrant requirement presumes any information offered to establish probable cause for a warrant is "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165. The Court accordingly determined that the proper sanction for the inclusion of material, false information in an affidavit is to exclude any evidence gained through the resulting search warrant. *Id.* at 168, 171.

In his motion to suppress, Mr. Norton pointed to the discrepancies between Chief Romero's initial statement to Deputy Vigil—when he said he "did not see Ms. Perez take any object or place anything in her purse"—and the statement in the search-warrant affidavit that "Chief Romero observed [Ms. Perez] remove an object from the small of [Mr. Norton's] back and place it into her black purse." ROA at 21. Mr. Norton argued that under *Franks* his DNA should be suppressed because this

6

misstatement of fact was material to establishing probable cause for the search warrant and evinced "a reckless disregard for the truth." *Id.* at 23.

The district court found Mr. Norton had made a preliminary showing of a *Franks* violation and conducted a hearing into the matter, at which Chief Romero and Agent Acee both testified. Chief Romero testified that, on the day in question, he and Ms. Martinez were sitting inside the Saloon by a window and could observe Mr. Norton and Ms. Perez. He did not state that his view was obstructed. Chief Romero averred that he saw Mr. Norton put his hands up when the task force arrived, and at that point Ms. Perez walked behind Mr. Norton, "picked up his jacket," "grabbed something from the jacket[,] and then she stepped back." *Id.* at 168. But on further examination, he admitted he did not actually witness Ms. Perez take any object from Mr. Norton. *Id.* at 169, 174.

Agent Acee then testified that when he interviewed Chief Romero, the Chief indicated that "he had been a police officer for 30 years or more, he had worked undercover, he was familiar with bikers, [and] he [rode] motorcycles." *Id.* at 194. According to Agent Acee, Chief Romero stated he saw Mr. Norton step in front of Ms. Perez, at which point she lifted his vest, "removed an object from [his] vest," and she "put it in a purse." *Id.* at 195. Agent Acee stated that he sent a draft of the search-warrant affidavit to Chief Romero for his review before filing, and the Chief "confirm[ed] the information" in the affidavit was correct. *Id.* at 199.

Agent Acee also testified he had not reviewed Deputy Vigil's lapel video until he prepared for the *Franks* hearing. Agent Acee agreed that there were discrepancies

between Chief Romero's initial statement in the video and the Chief's statement to the Agent. Specifically, unlike in his statement to Agent Acee, Chief Romero did not tell Deputy Vigil that Ms. Perez put an object into her purse.

On March 12, 2024, after receiving supplemental briefing from both parties, the district court entered an order granting Mr. Norton's motion to suppress, finding he had established a *Franks* violation.[2] First, the court found the statement in the affidavit that Chief Romero observed "[Ms. Perez] remove an object from the small of [Mr. Norton]'s back and place it into her black purse" was more likely than not false, in light of the Chief's unequivocal statement to Deputy Vigil "that he did not see anything removed" by Ms. Perez. *Id.* at 255, 257. And the court found it more likely than not that Chief Romero made the false statement to Agent Acee, because the Chief had made several inconsistent statements regarding what he had witnessed, even at the *Franks* hearing. Second, the court found Chief Romero made the false statement "with reckless disregard for the truth." *Id.* at 261. Third, the court found the false statement was material to the finding of probable cause for a warrant, because once the statement was excised from the affidavit, nothing tied the gun in Ms. Perez's purse to Mr. Norton.

The court also rejected the Government's argument that the DNA evidence should not be suppressed because Chief Romero was not a "government employee"

---

[2] The Government expressly does not challenge this finding on appeal. *See* Appellant's Br. at 15 n.11.

bound to the requirements of *Franks*, in that he was off duty and lacked an official investigatory role. The court held that the Government is "accountable for statements made not only by the affiant but also for statements made by other government employees [that] were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit." *Id.* at 267 (quoting *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)). The court noted that *Kennedy* broadly states that *Franks* applies to all "government employees," and it found that *United States v. Garcia-Zambrano*, 530 F.3d 1249 (10th Cir. 2008), establishes that *Franks* extends even to off-duty police officers. *Id.* at 269–270.

Alternatively, the court ruled that "even if some role in the investigation was required before Chief Romero's reckless statement" could amount to a *Franks* violation, the Chief actively participated in the investigation. *Id.* at 270. In arriving at this conclusion, the court noted that Chief Romero independently questioned the Saloon's staff about the location of cameras, relayed that information to Deputy Vigil, and gave the Deputy unsolicited information about what the motorcyclists were doing before the task force arrived and about a bartender who was friendly with one of the motorcyclists. Chief Romero also told Deputy Vigil that Mr. Norton "was a 'full Mongol'" based on the patches on his jacket. *Id.* at 272 (quoting Lapel Video at 2:55). In addition, the court found it significant that both Deputy Vigil and Agent Acee treated Chief Romero "as an experienced and knowledgeable law enforcement officer who could assist in the investigation and be relied on for credible information." *Id.* at 273. Indeed, Deputy Vigil used the Chief's

9

statement about Ms. Perez's suspicious actions to establish probable cause for Mr. Norton's initial arrest. And Agent Acee testified that he chose to speak with Chief Romero directly rather than with the officers who arrested Mr. Norton *because* he discovered the main witness, Chief Romero, was a law enforcement officer.

In totality, the court found that Chief Romero was "more than just a bystander." *Id.* at 272. Rather, he "approached law enforcement to provide assistance and information for the investigation based on his experience and knowledge as a law enforcement officer." *Id.* Because Chief Romero had violated *Franks*, the court held that the warrant for Mr. Norton's DNA violated the Fourth Amendment and granted the motion to suppress the unlawfully obtained DNA evidence.

## II.    JURISDICTION

This court has jurisdiction over the Government's interlocutory appeal from the district court's order suppressing evidence under 18 U.S.C. § 3731.

## III.    DISCUSSION

The Government makes a single argument on appeal: the district court erred by holding that *Franks* extends to Chief Romero, an off-duty police officer who did not have an official role in the investigation. The Government acknowledges that our caselaw holds it "accountable for statements made not only by the affiant but also for statements made by *other government employees* which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit." *Kennedy*, 131 F.3d at 1376 (emphasis added). But the Government urges there is nothing in *Kennedy* or other caselaw indicating that

*Franks* extends to all government employees, "encompassing every court clerk or Commerce Department analyst who happens to witness a crime." Appellant's Br. at 21. Rather, the Government argues our precedent shows that a government employee "must have an official investigatory role in the case to attribute [his or her] false statements to the government under *Franks*." *Id.* at 23.

But we need not determine the outer boundaries of *Franks.* Here, the district court found that Chief Romero was actually involved in the investigation and he participated with the knowledge and assent of the on-duty officers. Thus, the issue before us is whether an off-duty law enforcement officer who is permitted to be actually involved in an investigation can violate *Franks* by providing recklessly false information that is material to a search-warrant affidavit. In undertaking that analysis, we first explain our conclusion that the *Franks* rule is applicable to off-duty law enforcement officers permitted to be actually involved in an investigation. Second, we consider the standard of review applicable to the district court's determination that Chief Romero was actually involved in this investigation. Third, we apply that standard of review to the district court's decision and affirm.

### A.    *The Scope of* Franks

In *Franks,* the Supreme Court established that the Fourth Amendment requires the exclusion of evidence obtained through a search warrant that was issued only because an affiant recklessly or intentionally included false information in the search-warrant affidavit. 438 U.S at 155–56. The *Franks* Court also noted that the government may not avoid the Fourth Amendment's requirement of truthfulness by

attempting to "insulate one officer's deliberate misstatement merely by relaying it through an officer–affiant personally ignorant of its falsity." *Id.* at 163 n.6.

We have held this statement in *Franks* makes the government accountable "for statements made not only by the affiant but also for statements made by other government employees [that] were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit." *Kennedy*, 131 F.3d at 1376. In *Kennedy*, an affiant stated in a search-warrant affidavit that a police dog was fully police certified. *Id.* at 1374. But the affiant did not know that the dog's handler had not kept the dog up to date with trainings and fieldwork. *Id.* at 1374–75. The defendant thus argued that the dog was unreliable and that the handler's failure to give the affiant that information for inclusion in the affidavit was a material omission under *Franks*. *Id.* at 1375. The *Kennedy* court ultimately declined to find a *Franks* violation because the omitted information was immaterial to the finding of probable cause for a warrant.[3] *Id.* at 1379. But the court explicitly held an affiant cannot avoid the Fourth Amendment's requirement that truthful information be used to establish probable cause by including false information from *other* government officials within an affidavit. *Id.* at 1376. And we have since affirmed that holding. *See, e.g.*, *United States v. Campbell*, 603 F.3d 1218, 1229 (10th Cir. 2010).

---

[3] By conceding a *Franks* violation, the Government has waived any argument that the false information here was immaterial. *See United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009) ("Waiver occurs when a party deliberately considers an issue and makes an intentional decision to forgo it.").

12

Especially relevant here is *Garcia-Zambrano*. There, an off-duty police officer who had a second job as a courtesy officer at an apartment complex made false statements about a suspicious tenant to a police detective, who in turn included those statements in an affidavit for a warrant to search the tenant's apartment. *Garcia-Zambrano*, 530 F.3d at 1252–53. The off-duty police officer had independently investigated complaints from other residents and had provided information from his investigation to the detective–affiant. *Id.* On appeal, we did not question whether the off-duty officer's false statements could be imputed to the affiant under *Franks*; rather, we took as a given that those false statements should be excised from the affidavit. *See id.* at 1254–58 (reviewing various statements and holding that, even once they were excised from the affidavit, there was probable cause for a warrant).

The implications from *Garcia-Zambrano* call into question the Government's argument that an off-duty officer who has "no official role in the investigation" is not required to comply with *Franks*. Appellant's Br. at 25. The officer in *Garcia-Zambrano* was not acting in an "official" capacity by investigating the suspicions related to the apartment—rather, he investigated in his personal capacity and then gave information he had gathered to a police detective. *See Garcia-Zambrano*, 530 F.3d at 1252–53. Even so, the officer was actually involved in the investigation—the apartment would never have been searched if he had not independently investigated it and alerted his colleagues to the potential crime. *See id.* And the police detective accepted the information as true and incorporated it into his investigation. *Id.*

13

To the extent *Garcia-Zambrano* did not expressly address the theory the Government now advances—that *Franks* should not extend to an off-duty officer without an official investigatory role—this theory is inconsistent with the Supreme Court's reasoning in *Franks*. The Court there emphasized that the Fourth Amendment's requirement of probable cause "would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." 438 U.S. at 168. This concern does not dissipate simply because a police officer lacks an "official investigatory role." Appellant's Br. at 23. When actually involved in an investigation, an off-duty police officer such as Chief Romero or the officer in *Garcia-Zambrano* is positioned to commit "well-meaning violations of the search and seizure clause." *Id.* at 169 (quoting *Mapp v. Ohio*, 376 U.S. 643, 670 (1961) (Douglas, J., concurring)). Thus, an off-duty officer who is permitted to be actually involved in an investigation should be held to the same standard of truthfulness as other members of the investigative team.[4]

---

[4] Analogously, the government cannot insulate itself from complying with the Fourth Amendment by having a private party effect an otherwise-unconstitutional search or seizure. *See United States v. Souza*, 223 F.3d 1197, 1201–02 (10th Cir. 2000). When a private party effects a search or seizure, that party acts as an "agent" of the government and is subject to the Fourth Amendment if "the government knew of and acquiesced in the intrusive conduct" and the private party "intended to assist law enforcement efforts." *Id.* at 1201 (quotation marks omitted). Similarly, an off-duty police officer may become sufficiently involved in an investigation to be subject to the Fourth Amendment's requirement of truthfulness if the officer's involvement is *welcomed* by the investigative team and the officer deliberately takes investigative actions. *Cf. Skinner v. Ry. Labor Execs. Ass'n*, 489

Accordingly, consistent with *Garcia-Zambrano* and the logic of *Franks*, we hold that an off-duty police officer without an official role in an investigation may yet be bound by *Franks* if the officer was allowed to be actually involved in the investigation.[5]

### B.    Standard of Review

The district court concluded that Chief Romero was actually involved in the investigation into Mr. Norton's firearm possession based on his "participation in the investigation[] and the Government's reliance on the information he provided." ROA at 273. The parties dispute what standard of review applies to the determination that Chief Romero was actually involved. Mr. Norton argues this decision was a factual finding that should be reviewed for clear error. The Government argues the district court's decision amounts to a legal conclusion that should be reviewed de novo.

The district court's conclusion that Chief Romero was permitted to be actually involved in the investigation presents a mixed question of law and fact. A mixed question of law and fact exists when "historical facts are admitted or established, the

---

U.S. 602, 615–16 (1989) (holding a private company acted as an agent of the government when the government encouraged and endorsed the company's intrusive conduct).

[5] Although *Kennedy* and cases from other circuits broadly state that *Franks* applies to "government employees," *Kennedy*, 131 F.3d at 1376 (collecting cases), neither party has cited any *Franks* case involving a government employee who was not involved in the underlying investigation. But we need not and do not decide that issue today. Instead, we hold only that *Franks* extends to an off-duty law enforcement officer who is actually involved in an investigation.

rule of law is undisputed, and the issue is whether the facts satisfy the [] standard." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982). By contrast, a purely legal issue is "one that could be settled once and for all and thereafter would govern numerous" other cases. *Valdez v. McDonald*, 66 F.4th 796, 815 (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (2006)).

"Mixed questions are not all alike." *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 583 U.S. 387, 395–96 (2018). Some mixed questions "require courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard." *Id.* at 396. Others require courts to weigh "case-specific factual issues—compelling them to marshal and weigh evidence, make credibility judgments, and otherwise address . . . 'narrow facts that utterly resist generalization.'" *Id.* (quoting *Pierce v. Underwood*, 487 U.S. 552, 562 (1988)). The standard of review for any mixed question depends "on whether answering it entails primarily legal or factual work," *id.*, because appellate courts are "better positioned" to decide questions of law whereas trial courts are best equipped to make factual determinations, *Miller v. Fenton*, 474 U.S. 104, 114 (1985).

Here, the district court reviewed the uncontested facts about Chief Romero's actions and decided that, based on those facts, Chief Romero was so involved in the investigation that he was bound by *Franks*. This application of facts to arrive at a legal conclusion is a quintessential mixed question. *See U.S. Bank*, 583 U.S. at 396. Moreover, this decision was primarily factual in nature. It did not require the district court to scrutinize precedent or any other source of law. Rather, the court had to

16

consider the "case-specific historical facts . . . as a whole" and "balance[] them one against another." *U.S. Bank*, 538 U.S. at 397. A district court is better positioned than an appellate court to conduct this fact-intensive inquiry—a "trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). The standard with which we review the district court's determination of this primarily factual question thus must be deferential. *See Miller*, 474 U.S. at 114 (explaining "there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight").

Accordingly, we review the district court's finding that Chief Romero was actually involved in the investigation for clear error. *See Anderson*, 470 U.S. at 575 (holding that factual findings should typically be reviewed for clear error). Under this standard, we affirm "the district court's factual findings unless they are clearly erroneous," viewing "the evidence in the light most favorable to the district court's determination." *United States v. Burleson*, 657 F.3d 1040, 1044 (10th Cir. 2011) (internal quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1306 (10th Cir. 2015) (quoting *Anderson*, 470 U.S. at 574).

### C.    Application

The district court's conclusion that the task force allowed Chief Romero to be actually involved in the investigation into Mr. Norton is not clearly erroneous in light of the numerous facts in the record illustrating Chief Romero's close involvement in the investigation. Most importantly, shortly after the task force arrived at the Saloon, Chief Romero told the officers that he believed Ms. Perez had taken something from Mr. Norton. ROA at 32, 271; State Court Recording at 20:20. Upon receiving this information from Chief Romero, the task force tailored its investigation accordingly and asked Ms. Perez if she had a weapon. ROA at 271. Absent Chief Romero's action, nothing connected the gun in Ms. Perez's purse to Mr. Norton. Indeed, the only factual support in Deputy Vigil's statement of probable cause for Mr. Norton's arrest was the statement provided by Chief Romero and Ms. Martinez. *Id.* at 25.

Chief Romero acted consistent with his background and training throughout the incident. Before any task force members had arrived at the Saloon, Chief Romero began assessing the motorcyclists to determine whether any were "armed and dangerous." *Id.* at 271. Chief Romero noted a specific bartender who was friendly with one of the motorcyclists, *id.,* and independently investigated the location of cameras that would have captured Ms. Perez's actions, *id.* at 271–72. And Chief

Romero identified himself to the task force as a law enforcement officer and shared his information with Deputy Vigil.[6] *Id.*

Furthermore, in preparing the search-warrant affidavit for Mr. Norton's DNA, Agent Acee sought out and relied upon Chief Romero's experience as a law enforcement officer. The Chief told the Agent that he had thirty years of experience, including working undercover with motorcycle gangs. *See id.* at 194. Agent Acee testified that he chose to talk with Chief Romero *rather* than the task force members who arrested and booked Mr. Norton because the Chief "was a law enforcement officer." *Id.* at 193. Agent Acee did not interview any other witnesses before submitting the search-warrant affidavit. Instead, he assumed Chief Romero's statement was reliable because of the Chief's experience and training as a law enforcement officer. Agent Acee's reliance on Chief Romero is further illustrated by his decision to have Chief Romero (along with other members of the investigative team) review a draft of the search-warrant affidavit before the Agent submitted it to the magistrate judge. *See id.* at 91–96, 199.

In short, the district court's finding is not clearly erroneous because ample evidence in the record indicates that the task force members and Agent Acee assented

---

[6] Chief Romero's investigative actions and self-identification as law enforcement contrasts sharply with cases in which we have held that off-duty officers acted as private parties and were not subject to the Fourth Amendment. *See United States v. Cintron*, 482 F. App'x 353, 357–58 (10th Cir. 2012) (unpublished) (holding an off-duty officer working as a security guard was not subject to the Fourth Amendment because he was employed by a private company, acted to further that company's interests, and "never identified himself as a police officer").

to Chief Romero's actual involvement in this investigation. As such, the district court properly held the Government accountable for Chief Romero's false statement under *Franks* by suppressing the DNA evidence obtained through the unconstitutional search warrant.

## IV.   CONCLUSION

For the reasons above, we AFFIRM the district court's decision to grant Mr. Norton's motion to suppress.